MÁRQUEZ, PLAINTIFF AND APPELLEE, v. SUCCESSORS OF ABARCA,. DEFENDANT AND APPELLANT.

APPEAL from the District Court of San Juan in an Action for Breach of Contract and Damages.

No. 1996.—Decided April 16, 1920.

BREACH OF CONTRACT—WARRANTY—DAMAGES.—The seller of a refrigerating plant is not obliged to verify the needs of the buyer in order to furnish a plant that will supply his needs, and no damages can be recovered unless the needs of the buyer were made known to the seller who expressly or impliedly agreed to supply them.

ID.—ID.—ID.—When a refrigerating plant is sold to preserve six to eight hundred pounds of fish and it preserves the minimum amount at least, or a little more, it cannot be maintained that the plant does not come up to the agreement, and if in the absence of an agreement as to the time of preservation it is not sufficient to supply the wants of the buyer, the burden is on him to show that the plant was incapable of preserving such amount for a reasonable length of time, according to the general custom of the business.

The facts are stated in the opinion.

Mr. F. Soto Gras for the appellant.

Mr. C. Travecier for the appellee.

MR. JUSTICE WOLF delivered the opinion of the court.

In the case before us the theory of the complaint was that the defendant agreed to furnish a refrigerating plant complete and sufficient for the complete preservation of fish,. but the court in rendering judgment for the complainant abated somewhat from that theory. The view of the court, as expressed in its opinion, was somewhat as follows: That the complainant wrote to the defendant requesting an estimate for a refrigerating plant of certain dimensions described in the complaint and saying that he needed it for a fish business and that the plant should have the cold sufficient to· preserve fish.

The court found that the complainant knew very little· about the installation of a refrigerating plant; that he had a fish business to be carried into effect in San Juan, bringing the fish from a distance and preserving it in a refrigerating plant; that in pursuit of this idea, in his letter of February 13, 1917, he requested an estimate or plan of the plant,.

indicating the object for which he needed it; that the defendant, after consulting its expert, Mr. Estebanez, gave the estimate as shown in the letter of the 19th of February, 1917, and recommended a special tank to maintain the desired temperature without the necessity that the compressor should work continuously; that they had an interview in San Juan and for the court it was a fact that in this interview complainant satisfactorily explained to the defendant what he needed and the business for which the plant was to be used, hence the specification which appears in Exhibit "F" of the complainant describing the plant, and that this Exhibit "F" had a direct relation with Exhibit 1 of the defendant in which appears a design of the freezing room and that the temperature should be 32 degrees to freeze six or eight hundred pounds of fish from 85 to 32 degrees; that the plant was erected by the defendant in August, 1917; that from the first moment the plant worked badly and the fish decayed because of a lack of cold sufficient for its preservation, inasmuch as the plant did not regularly and constantly give 32 degrees Fahr. and perhaps because this temperature was not low enough to preserve the fish; that said fish decayed in two or three days and even in less time; that the expert of the defendant had knowledge of this fact and tried to remedy it but without success; that the plant continued to work in this way without possibility of saying that the defendant had delivered the plant to the complainant for the purposes for which the complainant needed it; that the court believed that the proof justified it in saying, as it did, that the cause of the plant's not working well was that some of the apparatus of the same, such as the condenser, were insufficient, and that the freezing room was badly constructed and badly insulated and did not keep up the cold or the low temperature and that, in consequence, the fish was preserved for a very short time without rotting. That the complainant did not ask for a plant to freeze the fish and keep it so and that the complainant did not so allege, but that it was un-

doubted that he explained the business to the expert Estebanez and to the defendant and that they knew that he wished to preserve the fish that he was offering for sale; that it was not logical to suppose that he only wanted fish to be preserved for some hours and not for various days and that the defense therefore was not sufficient; that once the complainant has shown that his object is to have a plant to produce cold for the preservation of fish he has performed his part and that the defendant had the technical knowledge necessary which the complainant did not have; that the defendant could investigate to satisfy itself of what the complainant needed with great exactitude and then make the estimate and thereafter the contract; that the defendant could not excuse itself on the ground that the plant was not 'sold for freezing fish, inasmuch as the letter of the 13th of February, 1917, stated to it: "Mine is a fish business and the plant ought to have the cold sufficient to preserve this commodity." The court found that it was not proved that the complainant opened the door of the freezing plant so constantly that this produced the rise of temperature, and then the court went on to consider the damages and rendered judgment not only for the damages actually suffered, but requiring the defendant to install a plant for the preservation of the fish.

In other words, the court held that this was a contract whereby the wants of the buyer were made known to the seller and that the latter undertook to comply with the said wants. The court did, in addition, say that the compressor and the freezing room did not have sufficient capacity, but this was only another way of saying that the machine did not come up to the specifications, wants or requirements of the complainant.

The conclusion of the court can mean nothing more necessarily than that, under the conditions in which the plant was being run by the complainant, the compressor and the freezing room were not sufficient. Having thus fixed the wants

of the buyer as a basis for the contract, the court then assumed, without further analyzing in what these alleged wants consisted, that they were not fulfilled.

We do not think that complainant maintains that his wants or needs should not be made manifest to the seller. At one place in its opinion there is a suggestion by the court that the defendant should have verified what the needs of the complainant were, but we cannot quite follow the court in this suggestion and we are bound to hold that the wants and needs of the buyer must be disclosed. Outside of the description of the plant as shown in the undisputed writings of the parties, the only additional element shown by the written and oral evidence and insisted upon by the complainant was that he wrote and told the defendant that his was a fish business and he wanted a plant to produce the cold necessary to preserve the fish.

In the examination of the complainant it was clearly shown that he expected the plant to preserve twelve or fifteen hundred pounds of fish for about three weeks. In a letter written by the plaintiff some time after the installation he said that he indicated that he wished to preserve the fish for fifteen or twenty days, which statement was not made under oath although he could have done so. On the subject of the time, however, there was no evidence that the complainant ever told the defendant or its agents that he wanted the plant to preserve fish for so long a period or indeed for any particular period whatsoever. The record is silent as to any custom of the fish business outside of the custom of this particular merchant and we have no knowledge of what is the usual time that fish ought to be preserved. On the contrary, the evidence tends to show, as rightly insisted upon by the defendant, that the complainant's business was of a transitory nature; that he generally bought fish in small quantities and sold most of his fresh fish immediately, and that he only wanted the plant for the preservation of the residue. There is no proof in the record even to suggest that this pres-

ervation for a long period was ever in the contemplation of either party before the contract was actually consummated. The plant, it is shown, with one possible exception, for practically all the time that it was being run, did preserve fish from three to six days. The conditions to which the plant was subjected when fish decayed is not shown in the proof, a matter to which we shall refer again. The complainant contented himself with a general showing that on several occasions fish decayed or became soft and had to be thrown away.

That six to eight hundred pounds was the amount specified in the negotiations was made clear by the weight of the evidence and the opinion of the court so that we shall not discuss the matter at length. On the theory of a response to the needs of Márquez Roig, the utmost, then, that could be exacted of the firm of Sucesores de Abarca was that it should supply a plant capable of preserving six to eight hundred pounds of fish for a reasonable length of time. It was incumbent on the complainant to show that preservation for three or four days was not a reasonable length of time but should have been longer. More especially it was necessary for him to show that, subject to the preservation of not more than six or eight hundred pounds, the plant did not do the work contracted for. This we think the complainant failed to do.

On the witness stand the complainant stated that he had to throw away, from time to time, in all about fifteen hundred pounds of fish, but he does not explain under what circumstances. He did say that he was apt to sell the fresher fish, and his employee says that he had on occasions as much as a thousand pounds there at one time. There is some indication that Márquez Roig himself tried to make the plant preserve up to 1,400 pounds, which he states the plant would contain. At any rate the possibility is suggested and certainly not excluded that when the fish decayed it was because too much fish was placed in the plant for the purposes of

the contract. The possibility also is not excluded that among the 1,400 or 1,500 pounds of decayed fish thrown away at various times, some of it at least may have been in the plant for a long time or some of it even may not have been in good condition when placed in the plant.

Some stress was laid upon the fact of the use of the expert Estebanez by the defendant. He did in fact act for the defendant, installed the plant or at least was around when it was installed, but from the time the plant was installed his intervention was limited to an attempt to make the plant answer to the conditions under which the complainant wanted it to work. It was made clear that this expert pointed out to the proposed purchaser the difference between a plant that would absolutely freeze fish, being much more expensive, and one that would merely maintain a temperature of about 32 degrees Fahr. and that Márquez Roig chose the latter kind of plant. It is also undisputed that the kind of machine delivered was ordinarily capable of reaching about this degree of cold. The machine, in practice, did not quite reach this low degree of temperature. The parties differ of course as to their theories for this failure. The appellee maintains that the machine was not sufficient for the alleged contract and the appellant maintains that the failure of the plant to register 32 degrees was for reasons caused by the purchaser, such as the opening and closing of doors, excessive amount of work put upon the machine and other causes not dependent upon the machine itself. The expert of the appellee, Mr. Seitz, when examined, stated that the plant was not a defective one and that it was a good type of machine.

Also, when a plant is sold to preserve six to eight hundred pounds of fish and it preserves the minimum amount or at least a little more, then it cannot be maintained that the plant has not come up to the agreement. As we said before, the burden was on the complainant to show that the plant was incapable of preserving six or eight hundred

pounds of fish for a reasonable length of time. The complainant did not show that the plant would not preserve six or eight hundred. pounds of fish. The possibility that at least one thousand pounds was attempted to be preserved is indicated by the evidence. The complainant says that he wanted to keep large quantities of fish to sell to ships, but that this was a part of his business and shown to the defendant the record does not disclose. The evidence does disclose, however, that a good part of the fish that had to be thrown away was attempted to be sold to ships.

*Purity Ice Company* v. *Hawley Down Draft Furnace Company of Maryland,* 22 App. Cases, D. C. 573, was a case where a furnace was sold warranted to do certain things and the court held that the burden was on the purchaser to show that the furnace failed to conform to the warranted standards. Márquez Roig received the freezing plant, used it for two or three months and preserved quantities of fish in it, and the burden was clearly on him, as we have said, to show that the plant was incapable of performing the alleged agreement. It is true, as we have indicated, that the expert of the defendant helped install the plant and was to that extent responsible for its proper installation. It is true also, as found by the court, that the said expert suggested that the compressor was not large enough for the capacity of the plant. The expert suggested that the plant ought to have twice as large tubing for expansion purposes, but the expert does not say how much fish the plant contained at the time. The expert also said that the machine did not reach 32° Fahr. while he was examining it and said that 28 degrees might be enough to preserve fish for a short time, but not for two months. As we have said, he admitted that the machine worked as a York machine; that it was a good specimen of machine, and there was testimony tending to show that a temperature of 34 degrees was close enough ordinarily to comply with the contract.

In this case, as in the case of *Seitz* v. *Brewers' Refrigerat-*

*ing Company,* 141 U. S. 510, there is no pretence of fraud, accident or mistake. We may say with that court that this is not a case of an alleged defect in the process of the manufacture known to the vendor but not to the purchaser, nor of presumptive and justifiable reliance by the buyer on the judgment of the vendor rather than his own, but of the purchase of a specific article manufactured for a particular use and fit, proper and efficacious for that use but in respect to the operation of which in producing the desired result under particular circumstances the buyer found himself disappointed.

While the complainant here did put some reliance on the judgment of the defendant, the whole proof shows that the said defendant sold and delivered to the complainant a machine capable of doing all the work that the complainant disclosed was necessary. In addition, the defendant corporation explained that the plant was not one to freeze completely, as such a plant would be much more expensive, but only one capable of producing 32 degrees of Fahr. That the machine did not quite reach this point makes no difference, because the failure to reach exactly this point might be due to the special conditions under which it was running, without laying too much stress on the fact that the door of the plant was frequently being opened and closed for the purposes of complainant's business. The proof tends to show that the machine would preserve 600 to 800 pounds of fish under proper conditions for a reasonable number of days.

We have to a large extent followed the theory of the court that the defendant undertook to deliver a machine adequate for complainant's business. Nevertheless, a freezing machine is not an extraordinary one in these days. The York machine was a well known type of machine and was being sold by the defendant in good faith. The defendant represented that the machine would ordinarily produce 32 degrees temperature and preserve 600 to 800 pounds of fish.

If it failed to do exactly this thing, as in the *Seitz* v. *Brewers' Refrigerating Company, supra,* this was a mere expression of opinion and was not a warranty.

There was some indication in the evidence that the walls of the plant did not have sufficient protection to prevent heat from entering. In other words, that the contact with another wall was not sufficiently protected by cork or other material, but even supposing that this was part of the efficient cause for the failure of the plant to come up to the needs of the complainant, it was a matter which was susceptible of remedy. This question of the cork or the insulation of the plant would perhaps be a reason at best for an abatement of the price or for a direct claim of damages resulting from such a lack, but not for a general suit for damages as for a total breach of contract.

It is unimportant, as the case must be reversed, but the contract in the case was to install a specific plant and we hold, in opposition to the complainant, that it was formally installed. The theory of the complainant that he did not get a formal notification of the said installation finds no justification in the record.

The judgment must be reversed and the complaint dismissed.

*Reversed.*

Chief Justice Hernández and Justices del Toro, Aldrey and Hutchison concurred.