THE HURD-POHLMANN COMPANY, LIMITED, *v.* ENJI SUGITA, ET AL., COPARTNERS DOING BUSINESS UNDER THE FIRM NAME AND STYLE OF HOLLY BAKERY.

No. 2066.

ARGUED DECEMBER 15, 1932.     DECIDED DECEMBER 31, 1932.

PERRY, C. J., BANKS AND PARSONS, JJ.

This is an action of assumpsit to recover the unpaid balance of the purchase price of a machine called in the declaration a "No. 7 Dutchess Divider" sold and delivered by the plaintiff to the defendants. The defense was a breach of warranty. The case was tried in the circuit court without a jury and resulted in a judgment in favor of defendants. The plaintiff brings the case to this court on a bill of exceptions.

The contention of the plaintiff is that the machine was known by a trade-name and was sold under that name, that it was in good mechanical condition when delivered and that it is immaterial whether it could cut dough uniformly. The contention of the defendants is that they purchased the machine for the purpose of dividing uniformly into lumps for making bread the dough used in their bakery, that the plaintiff, in soliciting the purchase of their machine, represented that it could and would divide dough uniformly as to weight and that they relied upon the representations, the ability and the knowledge of the plaintiff in deciding to purchase a machine of that particular type.

Witnesses were examined and cross-examined at length, the transcript of their testimony covering more than six hundred pages. In some respects the evidence was contradictory. The circuit judge having seen the witnesses and heard their testimony made the following findings of fact in a written decision filed by him: "After succeeding in selling the defendants numerous pieces of machinery for their bakery, Ross informed them that it would be to their best interests to purchase a dough divider for their bakery, which would save them money and labor. He recommended that they purchase a Dutchess No. 7 Dough Divider and told them that it would increase the efficiency of their business and that it would divide

dough evenly and uniformly. There appears to be little doubt from the evidence and the surrounding circumstances that the defendants relied upon the salesman Ross and upon his statements and as a result thereof purchased the Dutchess No. 7 Dough Divider in question, making a down payment therefor and agreeing to pay the balance of the purchase price in installments. It furthermore appears to be clear from the evidence that neither salesman Ross nor the defendants themselves took into consideration or realized at the time the contract of sale was consummated that the defendants were making bread out of a rather thick or sticky form of dough, unsuited for passing through a dough divider. All of the evidence and the surrounding facts and circumstances clearly show that the salesman Ross was fully informed that the defendants wanted the dough divider for their bakery business to divide their dough and for no other purpose. When the dough divider arrived in Honolulu and was set up in the bakery of the defendants it would not divide their dough evenly and uniformly, that is, it was not suitable for the particular purpose for which it had been ordered. The plaintiff admits that this Dutchess No. 7 Dough Divider will not divide the dough made by the defendants. Plaintiff claims that defendants' dough is a peculiar form of dough of a sticky nature, not suitable for passage through a dough dividing machine. It is made in order to make bread of a particular nature to supply the demand of the orientals of this community for a particular form of bread suitable to their taste. Numerous attempts have been made to operate this Dutchess No. 7 Dough Divider but none of these have been very successful, so that in so far as the direct evidence in the case is concerned there appears to be none showing that this particular dough divider will successfully and uniformly and evenly divide dough, whether made according to the peculiar formula

of the defendants or otherwise. The defendants have refused to pay the balance due on the dough divider and have tendered the same back to the plaintiff, now claiming that the same is not reasonably fit for the particular purpose for which it was required. * * * Did the defendants expressly, or by implication, make known to the seller the particular purpose for which this dough divider was required? I believe that the evidence clearly shows that they did. The salesman Ross visited the defendants and their bakery upon numerous occasions and assisted and advised with them in transforming their bakery into a machine establishment and advised them to buy a dough divider. Under this set of facts it cannot be contended by any stretch of the imagination that the defendants did not make known, either expressly or by implication, to Ross that they wanted this dough divider for the particular purpose of dividing the dough that they were making. Did the defendants rely upon the seller's skill or judgment? On this point the evidence is also clear. The defendants did not go to Ross or plaintiff for a dough divider. Ross, the salesman of plaintiff, came to the defendants and advised them and talked them into buying a dough divider. Ross had previously sold them baking machinery which was working satisfactorily and thereby had assisted them in their business, and when he advised them to buy a Dutchess No. 7 Dough Divider doubtless they relied upon his skill or judgment, otherwise they would not have ordered this particular machine. Under these facts and circumstances, when Ross told the defendants that this Dutchess No. 7 Dough Divider would evenly and uniformly divide dough he stated in words no more and no less than that this machine would be reasonably fit for the purpose for which it was ordered or bought. No other reasonable interpretation can be placed upon these words. * * * Defendants relied upon

Ross and bought the divider in question because he, Ross, recommended it and said that it would divide dough uniformly. What dough is referred to that this machine would divide uniformly? The defendants' dough, of course. No other reasonable interpretation could be given to these words."

There was some evidence which would have legally supported findings to the contrary on some of these subsidiary issues. In this court, on exceptions, however, that is immaterial. If, as has been repeatedly held by this court, in a law action such as this, there was some substantial evidence tending to support the findings that were made those findings cannot be set aside. This court is not at liberty to weigh the evidence, to decide questions of credibility or to make new findings of its own. The only questions that can be passed upon by this court are questions of law and one of them is whether there was evidence sufficient to support the findings that were made.

On this point there can be no doubt. There was ample evidence tending to show that beginning with March, 1928, the defendants had been conducting a bakery known as the Holly Bakery. At first the various operations were conducted in the main by hand. One Ross, an agent of the plaintiff, visited the bakery from time to time and induced the defendants to purchase from his principal, successively, a moulder for $1,507.00, a rounder for $607.00, a slicer for $250.00, a double mixer for $2,078.00, and a proofer for $2,280.00, a total of over $6,700.00. In each of these instances the machine proved satisfactory, did its work as represented and was paid for. These transactions caused the defendants to have confidence in the representations and ability of the plaintiff and its agent. Having successfully sold these machines to the defendants, Ross next recommended that they purchase from him a dough divider, representing to them that

the installation and use of such a machine would result in a substantial saving to the defendants in respect of labor and in respect of bits of dough which under the old method were unnecessarily going into many loaves, producing excess weight. He represented that it would divide the dough uniformly as to weight. The defendants knew nothing of this particular dough divider, as indeed they did about any divider at all, and did not see one before ordering the machine, there being no sample in Honolulu in the possession of the plaintiff at the time. They relied upon the representations of Ross and upon his ability and that of his principal.

Enji Sugita, one of the defendants, owners and operators of the Holly Bakery, testified, *inter alia,* as follows: "Well, we trust Mr. Ross, we took lots of machinery from Mr. Ross, and the machines are all O. K. in good condition, so he came at last about the divider, but we did not have a divider, we didn't know nothing about that machine, and he said that it is a good thing for us to take the divider, that it would save one or two employees, for instance we have five employees, if we take that machine, if we order that divider we could save about two or three employees, then we would save fifty dollars in labor, and we could save one hundred and fifty dollars besides, besides that we did not lose any ounces, maybe we cut that by hand maybe lose about half an ounce every loaf of bread, that means, we was baking forty four hundred loaves at that time, if we lose half an ounce every loaf of bread, that means about twenty two hundred ounces, that is about one hundred loaves, and that it is one hundred we figure, that would be seven dollars, quick figuring shows seven dollars, which we can save every day, we can save every day, that will cut exactly one pound, sixteen ounces, not more not less, so we ordered that machine, he said this machine is all you need, I

said I don't care whether that is a Dutchess, or an England (English) machine, or German machine, as long as you take the order why you know that machine will make the right thing for us, he said, 'sure, this will fit you to work for your need,' so I said, 'all right, we have been doing business with you all this time, or since that time, your machinery were O. K. to us, to fit us,' so we trust Ross, and we said, 'Mr. Ross, you put in that order.' "

The agent, Ross, testified that while he was dealing with the defendants with reference to the Dutchess Divider, he knew that competitors, Nylen Brothers, were trying to sell them a divider made by another concern and that he told the defendants what, in his opinion, were defects in the other machine and what, in his opinion, were the merits of his particular machine; and that he told them that his machine would divide accurately. Other witnesses testified as follows: Ross had been talking about the divider for about two or three months; Ross said that the divider would save lots of money every day, that this divider "divides dough as you wanted it, if you set it to eighteen ounces it would cut eighteen ounces and not more or less." And there was much other evidence to the same general effect.

In the foregoing paragraphs we are not making any findings. We are simply observing that there was ample evidence to support them and they are substantially the same findings made by the circuit court. While there was some evidence to the contrary as to one of the tests, there was an abundance of evidence tending to show that in a variety of tests made with the divider at the Holly Bakery it did not cut the dough uniformly but cut it with substantial irregularity as to weight. Some of these tests were made with the dough regularly used by the defendants in the course of their business. Others, in consequence of suggestions made by the plaintiff, were made

with a dough containing more than the usual quantity of water. Still others were made with one or more kinds of dough regularly used by and obtained from Love's Bakery, one of Honolulu's leading bakeries. The same abundance of evidence showed that in none of these tests did the machine operate successfully but in all of them cut the dough without any uniformity as to weight. In the course of the trial counsel for the plaintiff stated: "We are perfectly willing to admit in the record that that stiff leather they had down there won't work. We can admit their evidence." Whereupon the presiding judge stated: "Counsel admits that your dough will not work in that machine. Now that question is settled." In this court, likewise, the plaintiff admits that the machine will not cut uniformly the dough made in the defendants' bakery in accordance with the formula regularly used by them. As observed by the trial judge, no evidence was adduced tending to show that the machine will cut uniformly any dough, whether prepared in accordance with the defendants' formula or some other baker's formula. The suggestion made by the plaintiff during the tests that the defendants should change their formula and make dough according to some other formula in order to have the machine succeed in its operations is without merit. As shown by the testimony, the defendants have found by experience that the customers to whom they cater prefer bread made in accordance with their formula. While it may be that nothing was said expressly between the parties in the course of their negotiations as to the machine being able to cut uniformly dough made according to the defendants' formula, the evidence adduced leads irresistibly to the inference and the conclusion, as stated by the trial court, that what was wanted by the defendants and what was being offered by the plaintiff's agent was a machine that would uniformly cut the defendants'

dough and not anybody else's dough. Common sense and common experience required that finding. Had plaintiff's agent stated at the time of the negotiations that the divider which he wished to sell would cut other doughs but not the defendants' dough, or had he stated even that he did not know whether it would cut their dough, it is fair to infer that there would have been no sale. His representations, as held by the circuit judge, could have meant nothing other than that it would successfully cut the particular kind of dough which the defendants were in the habit of making. In our opinion there was ample evidence to support the findings of the court below.

The case presented, then, is one in which the buyer expressly and by necessary implication, made known to the seller the particular purpose for which the machine was required and in which the buyer relied on the seller's skill, judgment and representations that the machine would be reasonably fit for that particular purpose and the question is whether under section 15 of the Uniform Sales Act (L. 1929, Act 189) there is, under subsection 1, an implied warranty that the goods shall be reasonably fit for the particular purpose or whether under subsection 4 there can be no such implied warranty because the machine had a patent or trade-name. The machine did have a patent or trade-name. It was known as the No. 7 Dutchess Dough Divider. At first reading, subsections 1 and 4 may seem to be contradictory. It is the duty of the court, however, to give them such a construction as to render them, if possible, consistent with each other. We think that it is possible to so construe them. If the contract or the sale is of a specified article under its patent or other trade-name, the purchaser relying upon his knowledge of the article gained either by experience with it or through information obtained from others than the seller,—if, in other words, the buyer relies upon his

own judgment that the machine named will serve his purposes and does not rely upon the judgment or ability of the seller, subsection 4 is applicable and no warranty is implied. If, on the other hand, the purchaser has no knowledge of what the machine can accomplish and relies wholly upon the representations of the seller in that regard and upon the seller's knowledge and ability, then in spite of the fact that the article has a patent or trade-name, subsection 1 is applicable and a warranty is implied. Other courts have so construed these subsections. For example, under the same provisions of the Uniform Sales Act, "It is true that, where the buyer orders a specific article or material for a specific purpose, even though that purpose be known to the seller, no warranty of fitness will ordinarily be implied, but, where an article is desired for a particular purpose and that purpose is known to the seller, and the buyer relies upon the seller to furnish him a suitable article, then a warranty of fitness will be implied, even though the article may have a well known and defined name or designation, or even though it be sold under a trade-name." *Davenport Ladder Co.* v. *Edward Hines Lumber Co.*, 43 Fed. (2d) 63, 68. "The transaction was not as matter of law within the provisions of the statute (St. 1908, c. 237, §15, cl. 4, now G. L. c. 106, §17, cl. 4) negativing the existence of an implied warranty of fitness in case of the sale of a specified article. It could have been found that the plaintiff purchased the preparation upon the 'recommendation' that it was superior to that which she had been using and which she desired to purchase and that it was suitable for use on account of its composition and healthful character. The statutory provision now considered applies where the transaction results from the desire of one to purchase and the obligation of another to deliver a definite article having a 'patent or other trade-name.' A seller who

recommends a specific thing as fit for the buyer's use does not bring himself within the help of this exception, where it can be found that his advice and judgment were relied upon and that. the article was not delivered in fulfilment of the buyer's offer to purchase goods identified by a name known to the trade and the seller's acceptance thereof. The existence of such a warranty is not negatived where the purchaser of an article, for a definite purpose rather than of a particular kind of merchandise, relies on the seller to supply him with something adapted to that end; the latter in that case does not escape liability by the recommendation and subsequent sale of an article having a trade-name." *Ireland* v. *Louis K. Liggett Co.,* 243 Mass. 243, 247. "In cases of sales of specified articles under a trade-name, where there may be no implied warranty of fitness for a particular purpose (section 96, subd. 5, Personal Property Law [as added by Laws 1911, c. 571] ), the buyer relies upon the trade-name as his guide of its fitness. Here the buyer relied, not upon the trade-name, but upon the statement of the seller's representative, which was communicated to defendant's manager. Therefore subdivision 5 of section 96 of the Personal Property Law does not apply." *Sachter* v. *Gulf Refining Co.,* 203 N. Y. S. 769, 770. "It is argued that subdivision (4) governs this case because the article sold was a patent article or had a trade-name; that it was sold as such and hence there was no warranty or liability on the part of the appellant. * * * If the premises in appellant's argument in this respect be admitted its conclusion unavoidably follows. But the facts in this case are not of that kind. These purchasers knew nothing about the article until they were persuaded of its supposed merits by the representations of the appellant, upon which they relied. It was the article appellant had told them about that they wanted and ordered. True, they had

the literature given to them by the appellant, and one or two of them ordered it by its patent or trade-name but it is entirely clear from the evidence in this case that the name was used by them only for the purpose of designating or identifying the article they wanted, being induced thereto by the representations and judgment of the appellant, upon which they relied. Had these purchasers gotten the information upon which they relied from some other source than the appellant and then ordered the goods from the appellant by its patent or trade-name the statute referred to would be applicable and the appellant would not be liable. Here, however, there was quite enough evidence to satisfy the jury, not simply that these buyers made known to the appellant the purpose for which they wanted and purchased the article and that they relied on the appellant's judgment, but also that the appellant through its agent expressly stated that the article would with safety accomplish their purpose." *Wisdom v. Morris Hardware Co.,* 274, Pac. (Wash.) 1050, 1052. "The fact that an article sold happens to have a trade-name does not exclude all warranties or even bring subdivision 4 into operation. The Sales Act is a codification of the common law. Williston on Sales, §§236A, 249; Rinaldi v. Mohican Co., 225 N. Y. 70, 121 N. E. 471. Subdivision 4 is a codification of what was the rule at common law in regard to a known, described, and definite article. There being considerable identification between the American and the English Sales Acts, reference will be made to the English cases. In Baldry v. Marshall (L. R. [1925] 1 K. B. Div. 260), the court, in construing the English Sales Act, stated: 'The mere fact that an article sold is described in the contract by its trade-name does not necessarily make the sale a sale under a trade-name. Whether it is so or not depends upon the circumstances.' The court gives illustrations, and then states: 'In my opinion the

test of an article having been sold under its trade-name within the meaning of the proviso is: Did the buyer specify it under its trade-name in such a way as to indicate that he is satisfied, rightly or wrongly, that it will answer his purpose, and that he is not relying on the skill or judgment of the seller, however great that skill or judgment may be.' In Sachter v. Gulf Refining Co. (Sup.) 203 N. Y. S. 769, it was held that a buyer, in purchasing trade-mark oil, relied upon the seller's representation that the oil was what the buyer's machinery required and not upon the trade-name, and that there was an implied warranty under section 96, subd. 1, of the Personal Property Law." *Foley* v. *Liggett & Myers Co.*, 241 N. Y. S. 233, 238. See, also, *Kansas City Bolt & Nut Co.* v. *Rodd*, 220 Fed. 750, 754, 755 and *Allis-Chalmers Mfg. Co.* v. *Frank*, 57 N. D. 295, 299.

The contention of the appellant that parole evidence was inadmissible to explain the terms of the contract or order for the Dutchess Divider cannot be sustained in view of the express provision of the statute (Uniform Sales Act, § 15, subsec. 1) that when the circumstances specified occur "there is an implied warranty" that the goods shall be reasonably fit for the purpose for which they were bought. The provision presupposes that the buyer makes known to the seller, *before the contract is finally entered into,* the particular purpose for which the goods are required and similarly that it is before the contract is signed that the buyer relies upon the seller's skill or judgment in coming to the conclusion that it would be to his interest to buy the seller's article. Under these circumstances the necessary inference is that the legislature intended that parole evidence should be admissible to prove the existence or the nonexistence of these two circumstances.

There was ample evidence, written and oral, tending

590

to support the finding that when the article proved unsuited to the particular purpose for which it was bought, the defendants offered to return it to the seller.

The exceptions are overruled.

*J. V. Hodgson* (*E. C. Peters* with him on the briefs) for plaintiff.

*P. Silver* (*F. E. Thompson* and *M. K. Ashford* with him on the brief) for defendants.

